UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
In re:                                :

AOG ENTERTAINMENT, INC., *et al.*,    :       Chapter 11
                                 :       Case No. 16-11090 (SMB)
                Debtors.       :       (Jointly Administered)
---------------------------------------------------------X
CORE LITIGATION TRUST, by and through  :
its duly appointed trustee, Peter Kravitz,  :
                                 :

                Plaintiff,     :
                                 :

      – against –         :       Adv. Pro. No. 17-01053 (SMB)
                                 :
APOLLO GLOBAL MANAGEMENT, LLC;  :
APOLLO GLOBAL SECURITIES, LLC;   :
APOLLO MANAGEMENT HOLDINGS GP, :
LLC; APOLLO MANAGEMENT HOLDINGS, :
L.P.; APOLLO MANAGEMENT GP, LLC;  :
APOLLO MANAGEMENT, L.P.; APOLLO  :
CORE HOLDINGS GP, LLC; APOLLO CORE :
HOLDINGS, L.P.; APOLLO CAPITAL    :
MANAGEMENT VII, LLC; APOLLO      :
ADVISORS VII, L.P.; APOLLO INVESTMENT :
FUND VII, L.P.; APOLLO OVERSEAS    :
PARTNERS VII, L.P.; APOLLO OVERSEAS  :
PARTNERS (DELAWARE) VII, L.P.; APOLLO :
OVERSEAS PARTNERS VII (DELAWARE   :
892), L.P.; APOLLO INVESTMENT FUND  :
(PB) VII, L.P.; MEDIARENA HOLDING B.V.; :
AP NMT COÖPERATIEF U.A.; AP NMT JV :
NEWCO B.V. 9D/B/A ENDEMOL SHINE   :
GROUP; ENDEMOL SHINE NORTH     :
AMERICA; ENDEMOL USA HOLDING INC.; :
TWENTY-FIRST CENTURY FOX, INC.; 21ST :
CENTURY FOX EUROPE AND ASIA;    :
and DOES 1-100,                :
                                 :
                Defendants.   :
---------------------------------------------------------X

**MEMORANDUM DECISION GRANTING MOTION FOR
REMAND BASED ON MANDATORY ABSTENTION**

**A P P E A R A N C E S :**

QUINN EMANUEL URQUHART QUINN
  EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010

> Michael Carlinsky, Esq.
> Scott C. Shelley, Esq.
> James C. Tecce, Esq.
> Eric D. Winston, Esq.
>       Of Counsel

*Attorneys for Plaintiff*

O'MELVENY & MYERS LLP
7 Times Square
New York, New York 10036

> Jonathan Rosenberg, Esq.
> Peter Friedman, Esq.
> Asher L. Rivner, Esq.
> Daniel S. Shamah, Esq.
>       Of Counsel

*Attorneys for Apollo Defendants*

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

The CORE Litigation Trust ("Trust") brought this proceeding in the Superior

Court of the State of California for the County of Los Angeles ("California State Court"),

as assignee of the Debtors' prepetition secured lenders, alleging that the Defendants

induced a breach of contract between the lenders and certain Debtor entities and

intentionally interfered with those contracts.  The Defendants removed the action to the

United States District Court for the Central District of California ("California Federal

Court"), the California Federal Court transferred the case to the United States District

Court for the Southern District of New York ("New York Federal Court"), and the latter

Court referred the proceeding to this Court.

2

The Trust has now moved for abstention and remand to the California State Court. (*See Memorandum of Law in Support of CORE Litigation Trust's Motion for Mandatory Abstention, Permissive Abstention, and Remand to California State Court*, dated Apr. 27, 2017 ("*Motion*") (ECF Doc. # 7.)[1] For the reasons that follow, the *Motion* is granted.

## BACKGROUND

The background discussion is derived from the *Complaint*, dated Dec. 12, 2016,[2] initially filed in the California State Court, proceedings before the California State Court and the California Federal Court and documents filed with this Court as part of the bankruptcy cases.

### A.    The Loan Agreements

At all relevant times, CORE Media Group, Inc. ("CORE Media") was engaged in the business of producing scripted and unscripted television shows, including "American Idol" and "So You Think You Can Dance." (*Complaint* at ¶ 3.) CORE Entertainment Holdings, Inc. ("CORE Holdings") owned the stock of CORE Entertainment, Inc. ("CORE Entertainment"), which in turn owned its U.S. operating

---

[1]     "ECF" refers to the docket in this adversary proceeding, and "ECF Main Case" refers to the docket in the bankruptcy case, Case No. 16-11090 (SMB).

[2]     A copy of the *Complaint* is annexed as Exhibit 1 to the *Declaration of Daniel. S. Shamah Esq. in Support of Defendants' Joint Opposition to Plaintiff's Motion to Remand or Abstain*, dated May 16, 2017 ("*Shamah Declaration*") (ECF Doc # 14).

subsidiary, CORE Media (collectively with CORE Holdings and CORE Entertainment, "CORE").[3] (*Complaint* at ¶ 49.)

On June 21, 2011, Apollo[4] acquired control of CORE through a leveraged buy-out. (*Complaint* at ¶ 52.)  The purchase price exceeded $500 million, $360 million of which was financed through a bridge loan.  (*Complaint* at ¶ 52.)  In December 2011, Apollo refinanced the $360 million bridge loan through two separate secured loans—a $200 million loan pursuant to a First Lien Term Loan Agreement ("First Loan Agreement"), and $160 million loan pursuant to a Second Lien Term Loan Agreement (the "Second Loan Agreement," and collectively with First Loan Agreement, the "Loan Agreements"). (*Complaint* at ¶¶ 53-55.)  CORE Entertainment was the borrower, the obligations were guaranteed by CORE Holdings, CORE Media and several other CORE affiliates, and the lenders under the First Loan Agreement and the Second Loan Agreement (collectively, the "Lenders") received first and second liens, respectively, on substantially all of the assets of CORE and its affiliates.  (*Complaint* at ¶¶ 54-55.)

Important to the claims at issue, the Loan Agreements included a "successor obligor" clause and a "change of control" clause.  (*Complaint* at ¶¶ 56-57.)  Section 6.05(a)(1) of each Loan Agreement provided that CORE would not merge with, or sell

---

[3]     CORE has undergone several name changes over the years, and as used in this opinion, CORE includes those predecessors.

[4]     As used in the *Complaint* (at p. 1), "Apollo" refers to the defendants Apollo Global Management, LLC; Apollo Global Securities, LLC; Apollo Management Holdings GP, LLC; Apollo Management Holdings, L.P.; Apollo Management GP, LLC; Apollo Management, L.P.; Apollo CORE Holdings GP, LLC; Apollo CORE Holdings, L.P.; Apollo Capital Management VII, LLC; Apollo Advisors VII, L.P.; Apollo Investment Fund VII, L.P.; Apollo Overseas Partners VII, L.P.; Apollo Overseas Partners VII (Delaware), L.P.; Apollo Overseas Partners VII (Delaware 892), L.P.; and Apollo Investment Fund (PB) VII, L.P. (collectively herein, the "Apollo Defendants.")

substantially all of its assets to, another company unless the successor entity expressly assumed all of CORE's obligations under the Loan Agreements (the "Successor Obligor Clause").  (*Complaint* at ¶ 56 & Appendix A at 35.)  Section 2.08(f) of each Loan Agreement stated that in the event of a "Change of Control," CORE would prepay all outstanding loans plus a premium within 30 days of the Change of Control (the "Change of Control Clause").  (*Complaint* at ¶ 57 & Appendix A at 34-35.)  A "Change of Control" was defined as an acquisition by any person or group of more than 50% of the total voting power of the Voting Stock of the Borrower.  (*Complaint* at ¶ 57 & Appendix A at 34.)

The *Complaint* describes in detail a series of transactions, mergers and agreements orchestrated by the Defendants that resulted in breaches of the Successor Obligor and Change of Control Clauses, (*see Complaint* at ¶¶ 60-89), and CORE Entertainment and the guarantors defaulted under the Loan Agreements by failing to pay the principal, interest and premiums.  (*Complaint* at ¶¶ 90-95.)  In addition, the various actions drained CORE of liquidity, impaired its ability to perform its obligations under the Loan Agreements, interfered with the rights of the creditors under the Loan Agreements, prevented CORE from exploiting opportunities and made the exercise of the Lenders' rights more costly and burdensome.  (*Complaint* at ¶¶ 96-99.)

## B.    The Bankruptcy

The Debtors, including CORE, filed their chapter 11 cases on April 28, 2016, and confirmed their joint plan, (*see Second Amended Joint Chapter 11 Plan of Reorganization for AOG Entertainment, Inc. and Its Affiliated Debtors*, dated Aug. 4, 2016 ("*Plan*") (ECF Main Case Doc. # 294)), on September 22, 2016.  (*See Findings of*

*Fact, Conclusions of Law and Order Confirming Second Amended Joint Chapter 11 Plan of Reorganization for AOG Entertainment, Inc. and Its Affiliated Debtors*, dated Sept. 22, 2016 (ECF Main Case Doc. # 436).)  The *Plan* provided for the creation of the Trust, and stated that "[t]he Litigation Trust shall succeed to and constitute the assignee of all rights, powers and privileges that, before the Effective Date of the Plan, could be exercised by . . . the First Lien Lenders [and] the Second Lien Lenders . . . with respect to any suits, proceedings or Causes of Action that constitute Litigation Trust Assets against any party not released under the Plan." (*Plan* at § 7.1(a).)  The proceeds of any litigation commenced by the Trust would be distributed to the Lenders and the unsecured creditors in accordance with the *Plan*.  (*See Plan* at §§ 5.3-5.5).  The *Plan* became effective on October 17, 2016.  (*Notice of:  (I) Entry of Order Confirming Second Amended Joint Chapter 11 Plan of Reorganization for AOG Entertainment, Inc. and Its Affiliated Debtors; (II) Occurrence of Effective Date; and (III) Deadline for Filing Fee Claims, Administrative Expense Claims and Claims Arising from Rejection of Executory Contracts or Unexpired Leases*, dated Oct. 17, 2017 (ECF Main Case Doc. # 453).)  It is undisputed that the Defendants were not released under the *Plan*, and the claims asserted by the Trust are among those assigned by the Lenders.

## C.    The California Proceedings

As noted, the Trust commenced the lawsuit in California State Court on December 12, 2016, asserting claims of inducing a breach of contract, (*Complaint* at ¶¶ 110-25), and tortuously interfering with contract.  (*Complaint* at ¶¶ 126-39.)  There followed a series of procedural maneuvers by the Defendants.  On January 17, 2017, they filed an objection to the California State Court's order designating the action as "non-

complex." (*Declaration of Eric Winston in Support of CORE Litigation Trust's Motion for Mandatory Abstention, Permissive Abstention, and Remand to California State Court*, dated Apr. 27, 2017 ("*Winston Declaration*"), at Ex. 1 (ECF Doc. # 8).) "A 'complex case' is an action that requires exceptional judicial management to avoid placing unnecessary burdens on the court or the litigants and to expedite the case, keep costs reasonable, and promote effective decision making by the court, the parties, and counsel." CAL. RULES OF COURT, Rule 3.400(a). Judges are selected for complex litigation assignments based on "the needs of the court and the judge's ability, interest, training, experience (including experience with complex civil cases), and willingness to participate in educational programs related to the management of complex cases." CAL. RULES OF COURT, Standard 3.10(c). Designation as a complex case would have caused the case to be reassigned to the Los Angeles Superior Court Complex Civil Litigation Program. The California State Court overruled the objection on January 26, 2017. (*Winston Declaration*, Ex. 2.)

A few days later, the defendant Endemol USA Holding, Inc. filed a "Peremptory Challenge to Judicial Officer," asserting that Superior Court Judge Meiers, to whom the case was assigned, "is prejudiced against the party (or his or her attorney) or the interest of the party (or his or her attorney), so that the declarant cannot, or believes that he or she cannot, have a fair or impartial trial or hearing before the judicial officer." (*Id.*, Ex. 3.) The challenge automatically resulted in the assignment of a new judge in the California State Court. CAL. CODE CIV. PROC. § 170.6(a)(4).

Two days later, the Apollo Defendants filed a *Notice of Removal* with the consent of all Defendants,[5] and the case was removed to the California Federal Court.[6]  The Trust moved to remand the case to the California State Court, and several Defendants moved to transfer venue to the New York Federal Court.  By *Statement of Decision re: Joint Motion to Transfer*, dated Apr. 5, 2017 ("*Venue Decision*"),[7] the California Federal Court transferred the venue of the case to the New York Federal Court for convenience, fairness and judicial economy, and left it to the New York Federal Court or this Court to determine, in the first instance, whether the litigation is within this Court's jurisdiction and whether the litigation should be remanded to the California State Court. (*Venue Decision* at 5.)  The California Federal Court stated that the vast majority of the parties and witnesses were based in New York, "the operative facts that form the basis for the alleged tortious conduct occurred in the Southern District of New York, including the negotiation and execution of the Loan Agreements, the negotiations and execution of transactions and agreements that allegedly interfered with the Loan Agreements, and various board meetings," the Loan Agreements contained New York forum selection clauses and the California Federal Court and the State of California had no particular interest in the parties or the subject matter of the action.  (*Id.* at 6-9.)  Finally, the California Federal Court found that

---

[5]    The *Notice of Removal* failed to state whether the Defendants consented to the entry of final orders or a judgment by the bankruptcy court as required Rule 9027(a)(1) of the Federal Rules of Bankruptcy Procedure.

[6]    A copy of the *Notice of Removal* is annexed as Exhibit 14 to the *Supplement Declaration of Eric Winston in Support of Core Litigation Trust's Motion for Mandatory Abstention, Permissive Abstention, And Remand to California State Court*, dated May 26, 2017 ("*Winston Supplemental Declaration*") (ECF Doc. # 18).

[7]    A copy of the *Venue Decision* is annexed as Exhibit 10 to the *Shamah Declaration*.

> (i) the Southern District of New York is better-equipped to decide the legal issues in this case, as New York law will likely govern most, if not all, of the claims here; and (ii) the court system in New York is less congested than California Superior Court (Plaintiff's preferred forum) and likely just as, if not less, congested than this Court's docket.

(*Id.* at 10.)  Upon the transfer of venue to the New York Federal Court, the litigation was referred to this Court under the *Standing Order of Reference Re: Title 11*, M10-468, 12 Misc. 32 (LAP) (S.D.N.Y. Jan. 31, 2012).  (*Order* (S.D.N.Y. Apr. 20, 2017) (ECF Doc. # 1).)

## D.    The *Motion*

The Trust has moved for an order abstaining from deciding the claims and remanding the action to the California State Court.  It relies on principles of mandatory abstention, 28 U.S.C. § 1334(c)(2), permissive abstention, 28 U.S.C. § 1334(c)(1), and remand based on equitable considerations under 28 U.S.C. § 1452(b).  It argues, in the main, that the Court has, at most, non-core or "related to" jurisdiction, (*Motion* at 6-10), and the remaining five elements of mandatory abstention, discussed below, are satisfied.  (*Motion* at 10-16.)  If, however, mandatory abstention does not apply, the Court should abstain in the exercise of its discretion or remand the action on equitable grounds.  (*Motion* at 16-25.)

The Defendants argue in opposition that the Court has "related to" jurisdiction. (*Defendants' Joint Memorandum of Law in Opposition to Plaintiff's Motion to Remand or Abstain*, dated May 16, 2017 ("*Defendants Memo*"), at 10-14 (ECF Doc. # 13).)  They also contend that the Court has core jurisdiction.  (*Id.* at 14-17.)  Furthermore, mandatory abstention is inapplicable because the lawsuit cannot be timely adjudicated

in California State Court.  (*Id.* at 17-21.)  Finally, permissive abstention and equitable

remand are inapplicable.  (*Id.* at 21-30.)

## DISCUSSION

Section 1452(b) of title 28 authorizes the Court to remand a claim or cause of

action on any equitable ground, and the principles of mandatory abstention apply to a

removed action.  *Mt. McKinley Ins. Co. v. Corning Inc.*, 399 F.3d 436, 446-47 (2d Cir.

2005).  Section 1334(c)(2) governs mandatory abstention.  The Court must abstain if (1)

the motion to abstain was timely; (2) the action is based on a state law claim; (3) the

action is "related to" but not "arising in" a bankruptcy case or "arising under" the

Bankruptcy Code; (4) Section 1334 provides the sole basis for federal jurisdiction; (5) an

action is commenced in state court; and (6) that action can be "timely adjudicated" in

state court.  *N.Y. City Employees' Ret. Sys. v. Ebbers* (*In re WorldCom, Inc. Secs.*

*Litig.*), 293 B.R. 308, 331 (S.D.N.Y. 2003) ("*WorldCom*"), *aff'd sub nom. Cal. Pub.*

*Employees' Ret. Sys. v. WorldCom, Inc.,* 368 F.3d 86 (2d Cir. 2004), *cert. denied*, 543

U.S. 1080 (2005); *Renaissance Cosmetics, Inc. v. Development Specialists Inc.*, 277

B.R. 5, 12 (S.D.N.Y. 2002); *In re Dreier*, 438 B.R. 449, 457 (Bankr. S.D.N.Y. 2010).

There is conflicting case law regarding who bears the burden of proof on a

remand motion.  Generally, when removal of an action to federal court is challenged, the

removing party "has the burden of establishing that removal is proper."  *United Food &*

*Commercial Workers Union, Local 919, AFL-CIO v. CenterMark Props. Meriden*

*Square, Inc.*, 30 F.3d 298, 301 (2d Cir. 1994); *WorldCom*, 293 B.R. at 316.  Therefore,

on a motion to remand "the party seeking to sustain the removal, not the party seeking

remand, bears the burden of demonstrating that removal was proper."  *Wilds v. United*

*Parcel Serv., Inc.*, 262 F. Supp. 2d 163, 171 (S.D.N.Y. 2003) (quoting *Hodges v. Demchuk*, 866 F. Supp. 730, 732 (S.D.N.Y. 1994).)  Unless that burden is met, "the case must be remanded back to state court," *Bellido-Sullivan v. Am. Int'l Grp., Inc.*, 123 F. Supp. 2d 161, 163 (S.D.N.Y. 2000), and "out of respect for the limited jurisdiction of the federal courts and the rights of states, we must 'resolv[e] any doubts against removability.'" *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 488 F.3d 112, 124 (2d Cir. 2007) (quoting *Somlyo v. J. Lu–Rob Enters., Inc.,* 932 F.2d 1043, 1045-46 (2d Cir. 1991); *accord Castillejo v. BJ's Wholesale Club, Inc.*, 16-CV-6973 (VSB), 2017 WL 1929561, at *1 (S.D.N.Y. May 9, 2017); *DeAngelis v. Corzine* (*In re MF Global Holdings Ltd.*), 501 B.R. 155, 158 (S.D.N.Y. 2012).

In *WorldCom*, however, the District Court stated that the party seeking mandatory abstention has the burden of proof.  *WorldCom*, 293 B.R. at 331.  This conclusion is open to question.  In *Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*, 639 F.3d 572 (2d Cir. 2011) ("*Parmalat I*"), the Second Circuit observed in addressing the timely adjudication factor that the allocation of the burden of proof to the party seeking remand "may nevertheless be inconsistent with the mandatory nature of abstention under § 1334(c)(2) as well as the principles of comity, which presume that a state court will operate efficiently and effectively." *See id.* at 582.  It declined to decide the question, but since *Parmalat I*, courts have placed the burden of proof on the party *opposing* remand. *E.g., BGC Partners, Inc. v. Avison Young (Canada), Inc.*, 919 F. Supp. 2d 310, 319 n.66 (S.D.N.Y. 2013) (noting *Parmalat I*'s admonition and concluding "particularly in the context of removal, where any doubts are to be resolved against removability, the burden should be on defendants to prove that the state court *cannot*

11

adjudicate the claims in a timely manner.") (emphasis in original); *Fried v. Lehman Bros. Real Estate Assocs. III, L.P.*, 496 B.R. 706, 711 (S.D.N.Y. 2013) (same); *In re Fairfield Sentry Ltd. Litig.*, 458 B.R. 665, 690 (S.D.N.Y. 2011) (same).

This conclusion is also patently correct with respect to the jurisdictional prong because the party invoking federal jurisdiction has the burden of proving that jurisdiction exists. *See CenterMark Properties Meriden Square*, 30 F.3d at 301 ("[T]he party asserting jurisdiction bears the burden of proving that the case is properly in federal court . . . ."). Moreover, the allocation of the burden of proof on all of the remaining issues to the party opposing remand is consistent with the principles identified in *Parmalat I*. "Federal courts abstain out of deference to the paramount interests of another sovereign, and the concern is with principles of comity and federalism." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 723 (1996). Absent contrary evidence, a federal court must presume that a state court will operate efficiently and effectively in adjudicating the matters before it.

Accordingly, the Court concludes that the Defendants bear the burden of proving that mandatory abstention is not warranted. The parties agree that the motion was timely, the action is based on state law, 28 U.S.C. § 1334 supplies the only basis for federal jurisdiction and the action was commenced in state court. They dispute only whether the Court's jurisdiction is core or non-core, and whether the action can be timely adjudicated in the California State Court.

A.    **Jurisdiction**

    1.    **Introduction**

    Bankruptcy jurisdiction extends to all cases and to all civil proceedings, including this adversary proceeding, "arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). Core proceedings correspond to proceedings "arising under title 11" and proceedings that "arise in" cases under title 11. *Stern v. Marshall*, 564 U.S. 462, 476 (2011); *Fairfield Sentry*, 458 B.R. at 674. Proceedings "arise under" title 11 "when the cause of action or substantive right claimed is created by the Bankruptcy Code." *Id.*; *accord ResCap Liquidating Tr. v. Primary Capital Advisors* (*In re Residential Capital, LLC*), 527 B.R. 865, 870 (S.D.N.Y. 2014). Proceedings "arise in" a bankruptcy case if they "are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy." *Baker v. Simpson,* 613 F.3d 346, 351 (2d Cir. 2010) (per curiam) (quoting *In re Wood,* 825 F.2d 90, 97 (5th Cir. 1987)).

    Title 28, section 157(b)(2) sets forth a non-exclusive list of core proceedings that "provides courts with ready examples of such matters." *Stern v. Marshall*, 564 U.S. at 476. Nevertheless, "the determination of whether a particular proceeding is core or non-core cannot be made by simply consulting that list," *LFD Operating, Inc. v. Gen. Elec. Capital Corp.* (*In re Ames Dep't Stores, Inc.*), No. 06 cv 5394(BSJ)(THK), 2008 WL 7542200, at *6 (S.D.N.Y. June 4, 2008), *aff'd*, 319 F. App'x 40 (2d Cir. 2009), and "[w]hether a claim is core or non-core is determined on a 'case-by-case basis by evaluating both the form and the substance of the particular proceeding.'" *Fairfield Sentry*, 458 B.R. at 675 (quoting *Ames Dep't Stores*, 2008 WL 7542200, at *6).

Generally, "[p]roceedings can be core by virtue of their nature if either (1) the type of proceeding is unique to or uniquely affected by the bankruptcy proceedings , . . or (2) the proceedings directly affect a core bankruptcy function." *United States Lines, Inc. v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n* (*In re United States Lines, Inc.*), 197 F.3d 631, 637 (2d Cir. 1999) (citations omitted), *cert. denied*, 529 U.S. 1038 (2000).

Non-core proceedings correspond to "related to" proceedings and involve claims that do not arise in a bankruptcy case or arise under the Bankruptcy Code, but whose outcome may have a "conceivable effect" on the bankruptcy case. *Publicker Indus. Inc. v. United States* (*In re Cuyahoga Equip. Corp.*), 980 F.2d 110, 114 (2d Cir. 1992); *Pacor, Inc. v. Higgins* (*In re Pacor, Inc.*), 743 F.2d 984, 994 (3d Cir. 1984), *overruled in part on other grounds by Things Remembered, Inc. v. Petrarca,* 516 U.S. 124, 124-25 (1995). "An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *Pacor*, 743 F.2d at 994; *accord Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n.6 (1995).

Section 1334 does not expressly limit bankruptcy jurisdiction following plan confirmation. *U.S. Brass Corp. v. Travelers Ins. Gro., Inc. (In re U.S. Brass Corp.)*, 301 F.3d 296, 304 (5th Cir. 2002). Nevertheless, bankruptcy case law has long recognized that once confirmation occurs, the bankruptcy court's jurisdiction shrinks. *Penthouse Media Grp. v. Guccione (In re General Media, Inc.)*, 335 B.R. 66, 73 (Bankr. S.D.N.Y. 2005). To invoke the bankruptcy court's post-confirmation jurisdiction a party must show that the plan provides for the retention of jurisdiction over the dispute, and the matter has a "close nexus" to the bankruptcy plan. *Cohen v. CDR Creances S.A.S. (In re*

14

*Euro-Am. Lodging Corp.*)*, 549 F. App'x 52, 54 (2d Cir. 2014); *Ace Am. Ins. Co. v. State
of Michigan Workers' Comp. Ins. Agency* (*In re DPH Holdings Corp.*), 448 F. App'x
134, 137 (2d Cir. 2011), *cert. denied*, 567 U.S. 935 (2012); *General Media*, 335 B.R. at
73-74.  The "close nexus" test is met "when a matter affects the interpretation,
implementation, consummation, execution, or administration of the confirmed plan or
incorporated litigation trust agreement."  *Id.* at 73 (quoting *Resorts Int'l Fin., Inc. v.
Price Waterhouse & Co., LLP* (*In re Resorts Int'l, Inc.*), 372 F.3d 154, 168-69 (3d Cir.
2004); *accord Residential Capital*, 527 B.R. at 870-71; *In re Metro-Goldwyn Mayer
Studios Inc.*, 459 B.R. 550, 556 (Bankr. S.D.N.Y. 2011).  "The 'close nexus' inquiry
insures that at the post-confirmation stage, the matter before the court 'affects an
integral aspect of the bankruptcy process.'"  *Id.* (quoting *Resorts Int'l,* 372 F.3d at 167).

## 2.    Jurisdictional Allegations

In determining whether federal jurisdiction is proper, the Court looks only to the
jurisdictional facts alleged in the Notice of Removal.  *MTBE*, 488 F.3d at 124; *MF
Global*, 501 B.R. at 157 n.2.  The *Notice of Removal* alleges that the adversary
proceeding implicates the claims allowance process, a core function.  (*Notice of
Removal* at ¶ 22.)  On June 21, 2011, Apollo CORE Holdings, L.P. entered into an
indemnification agreement with CORE Holdings and CORE Media at the time that the
entities affiliated with Apollo acquired those entities.  The Indemnification Agreement
required CORE Holdings and CORE Media to indemnify the Apollo indemnitees for
certain costs, expenses, settlements or judgments.[8]  (*See Notice of Removal* at ¶ 15

---

[8]        A copy of the Indemnification Agreement is annexed as Exhibit 2 to the *Shamah Declaration.*

(quoting Indemnification Agreement).)  The parties apparently agree that the claims asserted in this adversary proceeding and the related costs are covered by the Indemnification Agreement but for the possible exclusions identified below.

Three Apollo Defendants, Apollo Global Securities, LLC, AP NMT Coöperatief U.A. and AP NMT JV Newco B.V. (collectively, the "Apollo Claimants"), have filed proofs of claim (collectively, the "Indemnification Claims") in the CORE bankruptcy based on the Indemnification Agreement.  (*Notice of Removal* at ¶¶ at 16-17.)[9]  Under the *Plan*, the reorganized Debtors have until April 17, 2017 to object to claims,[10] and because the Indemnification Claims are unliquidated, the reorganized Debtors will either have to object to the claims or seek to estimate them.  (*Notice of Removal* at ¶ 23.)

The *Notice of Removal* also alleges that the adversary proceeding satisfies the "close nexus" test, and is therefore "related to" CORE's bankruptcy case.  (*Notice of Removal* at ¶ 25.)  In addition to the Indemnification Claims, (*Notice of Removal* at ¶ 26), the Trust's claims were brought in connection with their assignment to the Trust pursuant to the *Plan*, and the Trust's purpose is to liquidate the claims and distribute the proceeds to CORE's creditors.  (*Notice of Removal* at ¶ 27.)  It would be more efficient and less likely to lead to inconsistent decisions or erode the Court's exclusive

---

[9]    A fourth non-Apollo Defendant, Twenty-First Century Fox, Inc., filed a damage claim based on the rejection of the Indemnification Agreement.  (*See Shamah Declaration*, Ex. 6.)  The additional claim does not change the analysis.

[10]    On March 31, 2017, the Court extended the objection deadline to October 17, 2017.  (*Order Extending the Claims Objection Deadline*, dated Mar. 31, 2017 (ECF Main Case Doc. # 598).)

jurisdiction to interpret the Litigation Trust Agreement,[11] particularly in light of disputes that have already arisen between the Trust and certain attorneys and other professionals regarding access to privileged communications. (*Notice of Removal* at ¶¶ 18-20, 28-29.)

### 3.    The Court Lacks Core Jurisdiction

The Court concludes that it lacks core jurisdiction. The Trust's claims do not arise under title 11 or in a case under title 11. Although the Trust acquired the claims by assignment from the Lenders under the *Plan*, the claims themselves pre-date the bankruptcy cases, and are between non-debtor parties. Furthermore, although they may affect the amount of allowable indemnification claims, the adversary proceeding does not implicate the claims allowance process. At present, the Indemnification Claims are deemed allowed because no one has objected to them. *See* 11 U.S.C. § 502(a). They are also either contingent or, to the extent already incurred, they are fixed. However, they may still be disputed because indemnification is unavailable for acts that are willfully illegal, fraudulent or grossly negligent. (Indemnification Agreement at 2(a)(ii).)

If the Debtors do object to the Indemnification Claims, they will be required to commence a separate contested matter in accordance with Rule 3007 of the Federal Rules of Bankruptcy Procedure. The adversary proceeding is not a claim objection, and the tort claims that are the subject matter of the adversary proceeding are not the same as the contract claims for indemnification.[12] Moreover, the Debtors are not parties to

---

[11]    A copy of the Litigation Trust Agreement is annexed as Exhibit 6 to the *Notice of Filing Plan Supplement Relating to Second Amended Joint Chapter 11 Plan of Reorganization for AOG Entertainment, Inc. and Its Affiliated Debtors*, dated Sept. 12, 2016 (ECF Main Case Doc. # 378).

[12]    Although the filing of a proof of claim subjects a claimant to the bankruptcy court's jurisdiction for purposes of claims allowance, it does not subject the claimant to the bankruptcy court's equitable jurisdiction with respect to matters unrelated to the claims allowance process. *Germain v. Connecticut Nat'l Bank*, 988 F.2d 1323, 1330 (2d Cir. 2003) (discussing right to trial by jury); *Picard v. The Estate of*

the adversary proceeding.  This is not to say that the adversary proceeding and a hypothetical claim objection are unrelated; the results of the adversary proceeding may affect the amount and allowability of the Indemnification Claims.  Nevertheless, it is well-settled that the filing of a proof of claim for contribution or indemnity by a party to a state law claim against a non-party does not transform that proceeding into a core proceeding.  *In re Exide Techs.*, 544 F.3d 196, 215 (3d Cir. 2008) ("The proposition that a contingent proof of claim against a debtor for contribution or indemnification somehow [renders] state court claims against non-debtors 'core,' similarly receives no support in the case law."); *IIG Capital LLC v. Wollmuth Maher & Deutsch, LLP (In re Amanat*), 338 B.R. 574, 581 (Bankr. S.D.N.Y. 2005) ("Although cases have found certain proceedings to be core based on their overall impact on the estate, e.g., *United States Lines, Inc. v. Am. S.S. Owners Mut. Prot. & Indem. Assoc., Inc. (In re United States Lines, Inc.),* 197 F.3d 631 (2d Cir. 1999), there is no authority that a party with a contingent claim for indemnification can bootstrap its claim onto the Bankruptcy Court's core jurisdiction."); *cf. Allstate Ins. Co. v. Credit Suisse Secs. (USA) LLC,* No. 11 Civ. 2232(NRB), 2011 WL 4965150, at *4 (S.D.N.Y. Oct. 19, 2011) (potential for indemnification constitutes a "conceivable effect" supporting non-core jurisdiction).

Furthermore, the Defendants' case law is distinguishable because their two cases involved adversary proceedings that mirrored the bankruptcy claims process.  In *Central Vermont Public Service Corp. v. Herbert*, 341 F.3d 186 (2d Cir. 2003), the defendants' corporation filed for bankruptcy, and the plaintiff filed a proof of claim.  The

---

*Doris Igoin (In re Bernard L. Madoff Investment Securities LLC),* 525 B.R. 871, 887-88 (Bankr. S.D.N.Y. 2015) (addressing personal jurisdiction).

trustee entered into a settlement with the debtor corporation, and commenced an adversary proceeding, *inter alia*, to enjoin the plaintiff from asserting any derivative or alter ego claims regarding the debtor's debts. When the plaintiff defaulted in that adversary proceeding, the Bankruptcy Court entered a default judgment against it. *Id.* at 187-88.

Several years later, the plaintiff moved to set aside the injunction pursuant to Rule 60(b)(4) of the Federal Rules of Civil Procedure, arguing that the bankruptcy court lacked jurisdiction to enjoin it from asserting a claim against the defendants to recover the debt owed by the debtor. The Second Circuit framed the issue as whether the Bankruptcy Court had an "arguable basis" for jurisdiction to enter the injunction. *Id.* at 191. Among other things, the Court stated that the plaintiff's claims against the defendants were "core" because they were arguably claims against the debtor that arose from their alter ego relationship with the actual debtor and their liability for the debtor's debts. *Id.* at 192. Thus, there was a complete identity between the plaintiff's proof of claim in the bankruptcy case and its claims against the individual defendants, and the bankruptcy court's jurisdiction was therefore "arguable." The Defendants must show more than "arguable" jurisdiction.

Similarly, in *Sterling Vision, Inc. v. Sterling Optical Corp. (In re Sterling Optical Corp.)*, 302 B.R. 792 (Bankr. S.D.N.Y. 2003), the debtor sold its assets at a Bankruptcy Code § 363 sale to the buyer. The assets included certain notes (the "Notes") that the debtor argued it had previously pledged to secure a loan from Sanwa, but Sanwa contended it had bought the Notes outright and owned them. *Id.* at 794-95. Sanwa filed a proof of claim in the bankruptcy case, and the Creditors Committee filed an objection.

19

*Id.* at 797-98.  As it turned out, the proceeds of the Notes were sufficient to satisfy the debt to Sanwa.  In addition, the buyer filed an adversary proceeding against Fleet, Sanwa's successor, for a declaratory judgment that it was entitled to the receivables, and Fleet moved to dismiss the adversary proceeding for lack of subject matter jurisdiction.  *Id.* at 794.

Relying on *In re Petrie Retail, Inc.*, 304 F.3d 223 (2d Cir. 2002), the Bankruptcy Court concluded that the adversary proceeding was a core proceeding because the adversary proceeding and the Sanwa claim objection involved the interpretation of the sale order and the dispute implicated the core function of conducting and approving asset sales.  *Sterling Optical Corp.*, 302 B.R. at 807 (citing *In re Cedar Chemical Corp.*, 294 B.R. 224, 229 (Bankr. S.D.N.Y. 2003)).  The determinative question common to both proceedings was who owned the Notes and was entitled to the surplus generated through their collection.  Here, the adversary proceeding and the Debtors' hypothetical claim objection to the Indemnification Claims are not mirror images.  While there is some overlap for the reasons already stated, the merits of the tort claims and the indemnification claims raise completely different issues.

### 4.    The Court Has Non-Core Jurisdiction

The Court nevertheless has post-confirmation jurisdiction over the non-core claims asserted in the adversary proceeding.  The *Plan* reserves "exclusive jurisdiction" in this Court, *inter alia*, "[t]o determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date,"  (*Plan* at Art. XIII (b)), and "[t]o hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this

20

Plan, the Confirmation Order, any transactions or payments contemplated hereby, or any agreement, instrument, or other document governing or relating to any of the foregoing." (*Id.* at Art. XIII (k).) Consequently, the *Plan* cannot confer jurisdiction that does not otherwise exist under 28 U.S.C. § 1334, *Resorts Int'l*, 372 F.3d at 161 ("Where a court lacks subject matter jurisdiction over a dispute, the parties cannot create it by agreement even in a plan of reorganization."), and the proponent of the Court's jurisdiction must also demonstrate that the Court has jurisdiction under 28 U.S.C. § 1334(b). Among other things, the Defendants rely on the indemnification proofs of claim.

Although the filing of a claim for indemnity contingent on the outcome of a separate lawsuit does not support core jurisdiction, it satisfies the "conceivable effect" test and will support non-core or "related to" jurisdiction prior to confirmation. *See In re Amanat*, 338 B.R. at 581. However, post-confirmation jurisdiction requires a "close nexus," and consequently, the "conceivable effect" test no longer applies, at least in its pre-confirmation formulation. *Boston Regional Med. Ctr., Inc. v. Reynolds* (*In re Boston Regional Med. Ctr., Inc.*), 410 F.3d 100, 106 (1st Cir. 2005) ("Applying the general [jurisdictional] rule without qualification after the confirmation of a reorganization plan easily could result in the bankruptcy court retaining jurisdiction of all cases affecting the reorganized debtor for many years thereafter. This prospect not only would work an unwarranted expansion of federal court jurisdiction but also would unfairly advantage reorganized debtors by allowing such firms to funnel virtually all litigation affecting them into a single federal forum."); *Allstate Ins. Co. v. Ace Securities Corp.*, No. 11 Civ.1914(LBS), 2011 WL 3628852, at *4 (S.D.N.Y. Aug. 27, 2011) ("Courts

in this Circuit and others have held that the broad 'conceivable effect' standard for 'related to' bankruptcy jurisdiction no longer applies when plans of reorganization have already been confirmed by a bankruptcy court."); *Stillwater Liquidating LLC v. Net Five at Palm Pointe, LLC* (*In re Stillwater Asset Backed Offshore Fund Ltd.*), 559 B.R. 563, 574 (Bankr. S.D.N.Y. 2016) ("Courts have expressed concern that the continued application of the 'conceivable effect' test could result in an unwarranted exercise of jurisdiction over the post-confirmation business of a reorganized debtor.")

Courts addressing the question have concluded that an indemnification claim triggered by a post-confirmation lawsuit that is payable from the assets available for distribution to the creditors under the plan bears a "close nexus" to the plan and satisfies requirements for post-confirmation, "related to" jurisdiction. *See Allstate Ins. Co. v. Ace Securities Corp.*, 2011 WL 3628852, at *4 (collecting cases). This is such a case. Subject to the stated exceptions for gross negligence, fraud or a willful illegal act, CORE agreed to indemnify the Apollo Claimants for all Obligations if they became parties to a lawsuit by reason of any actions relating to CORE and its affiliates, or in furtherance of their interests. (Indemnification Agreement at 2(a)(ii).) There is no dispute that the claims asserted against the Apollo Claimants come within the broad indemnity provisions, and the Apollo Claimants have a right to indemnity subject to the noted exceptions. While the indemnity claims are contingent to the extent they seek reimbursement for a future judgment or settlement, the indemnification obligation includes litigation expenses and attorneys' fees. (*Id.* at § 1(hh).) The Apollo Claimants have presumably incurred expenses and legal fees and those indemnification claims are non-contingent and liquidated although they may still be disputed.

Accordingly, the Court has non-core, "related to" jurisdiction over the claims asserted in the adversary proceeding, and it is unnecessary to consider the other bases for non-core jurisdiction raised by the Defendants.

## B.    Timely Adjudication

### 1.    Introduction

The only other element pertaining to mandatory abstention in dispute is whether this action can be "timely adjudicated" in the California State Court. "Four factors come into play in evaluating § 1334(c)(2) timeliness: (1) the backlog of the state court's calendar relative to the federal court's calendar; (2) the complexity of the issues presented and the respective expertise of each forum; (3) the status of the title 11 bankruptcy proceeding to which the state law claims are related; and (4) whether the state court proceeding would prolong the administration or liquidation of the estate." *Parmalat I*, 639 F.3d at 580; *accord Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*, 671 F.3d 261, 266 (2d Cir. 2012) ("*Parmalat II*"). As noted earlier, abstention doctrines are grounded on principles of federalism and comity. "The four factors are meant to guide courts' analyses with respect to the ultimate balance, struck by Congress, between, on the one hand, creating a federal forum for purely state law cases which, due to delay, might impinge upon the federal interest in the administration of a bankruptcy estate, and, on the other, ensuring that purely state law cases remain in state courts when they would not significantly affect that federal interest." *Id.* at 269. "The factors are ultimately interrelated: an action might be 'timely adjudicated' in state court, despite some substantial delay, where the delay has little or no effect on the bankruptcy estate which creates the federal interest." *Id.* at 270. "Conversely, even a relatively brief delay

might make state court adjudication untimely where the state action substantially affects the bankruptcy estate, or where the estate's resolution is contingent upon the state action." *Id.*

"The first two factors require a court to consider timely adjudication in light of the particular factual and procedural circumstances presented in the two courts being compared." *Parmalat I*, 639 F.3d at 580.   "Timeliness . . . is a case- and situation-specific inquiry that requires a comparison of the time in which the respective state and federal forums can reasonably be expected to adjudicate the matter."   *Id.*  "The inquiry does not turn exclusively on whether an action could be adjudicated most quickly in state court.  *Id.; accord Parmalat II*, 671 F.3d at 266-67.  "It is, however, informed by the comparative speeds of adjudication in the federal and state forums." *Parmalat I*, 639 F.3d at 580.  "A court should therefore consider the backlog of the state court's calendar (if any) relative to the federal court's calendar."  *Id.*  "Ultimately, the relative adjudication times are not solely determinative, but do shed light on whether the state court can timely adjudicate the matter."  *Id.* at 581.  Where, however, the difference in timing is months rather than years, the difference is not dispositive.  *Parmalat II*, 671 F.3d at 267.

The second prong considers the factual and legal issues.  "Where the legal issues in a case are especially complex, the forum with the most expertise in the relevant areas of law may well be expected to adjudicate the matter in a more timely fashion relative to the other forum." *Parmalat I*, 639 F.3d at 580 (footnote omitted).  "On the other hand, when the facts in a case are especially complex, the forum with greater familiarity with

the record may likewise be expected to adjudicate the matter more quickly." *Id.* at 580-81.

The final two factors focus on the bankruptcy case. "As to the third factor—the status of the 'related to' title 11 bankruptcy proceeding—a court must consider whether the litigants in a state proceeding need the state law claims to be quickly resolved as a result of the status of the ongoing title 11 bankruptcy proceeding." *Parmalat I*, 639 F.3d at 581. If the lawsuit will not prolong the administration of the bankruptcy case, it supports the position that it can be timely adjudicated in state court. *Parmalat II*, 671 F.3d at 268. "Thus, a state court may be a 'timely' forum, even if it requires longer to adjudicate an action than a federal court, as long as the relevant bankruptcy proceedings will not be hindered by the relative delay." *Allstate Ins. Co. v. Credit Suisse Secs. (USA) LLC*, 2011 WL 4965150, at *7; *accord Post Invs. LLC v. Gribble*, No. 12 Civ. 4479(ALC)(AJP), 2012 WL 4466619, at *5 (S.D.N.Y. Sept. 27, 2012).

"Finally, the fourth factor asks whether the state court proceeding would prolong the administration or liquidation of the estate. A matter cannot be timely adjudicated in state court if abstention and remand of the state law claims will unduly prolong the administration of the estate." *Parmalat I*, 639 F.3d at 581. The considerations include "(i) whether the district court is concurrently charged with administration of the bankruptcy estate; (ii) close connections between the defendants in the action and the debtor; and (iii) the complexity of the litigation." *BGC Partners, Inc. v. Avison Young (Canada), Inc.*, 919 F. Supp. 2d at 320 (footnote omitted). The last two factors are only relevant and need to be addressed if the first two factors suggest that the federal court

25

would be the timelier forum.  *Post Invs. LLC v. Gribble*, 2012 WL 4466619, at *5;

*Allstate Ins. Co. v. Credit Suisse Secs. (USA) LLC*, 2011 WL 4965150, at *8.

### 2.    Factor One:  The Backlog

One or both parties have focused on three statistics to compare the backlogs and

the speed of adjudication in the California State Court and the New York Federal Court:

the clearance rate, the disposition time, and the filings per judge.  The clearance rate

compares the number of case filings and the number of case terminations during a

particular period.  A 100% clearance rate indicates that a court is keeping up with the

cases filed.  *Greenspond South, LLC v. Gen. Elec. Capital Corp.*, No. 14–cv–1214

(SRN/TNL), 2015 WL 225227, at *8 (D. Minn. Jan. 16, 2015); *Delphi Auto. Sys., LLC v.*

*Segway Inc.*, 519 F. Supp. 2d 662, 669 (E.D. Mich. 2007) (evidence that state court's

dispositions exceeded new filings supported conclusion that litigation could be timely

adjudicated in state court).  The Federal Court Management Statistics—Profile

pertaining to the New York Federal Court (the "SDNY Profile") available on the United

States Courts website shows that for four of the past six fiscal years (September 30, 2011

through September 30, 2016), the New York District Court cleared in excess of 100% of

its cases, *i.e.,* it terminated more cases than were filed during the same period.[13]  The

two exceptions are the fiscal year ended September 30, 2012, where there were 12,878

filings and 12,195 terminations, yielding a clearance rate of 95%, and the fiscal year

ended September 30, 2014, where there were 13,318 filings and 13,218 terminations,

---

[13]    The Federal Court Management Statistics-Profile is available at
(http://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0930.2016.pdf (last
visited July 17, 2017).  The relevant pages are annexed to the *Winston Declaration* as Exhibit 5.  The cited
web page includes a hyperlink to the "Explanation of Selected Terms" that will be referred to in the
succeeding text.

yielding a clearance rate of 99%.  According to the 2016 Court Statistics Report published by the Judicial Council of California ("2016 CSR")[14] the Los Angeles Superior Court cleared over 100% of its cases (civil and criminal) during fiscal year 2015, the last reported year.  (2016 CSR at 82.)  Statewide, the clearance rate for civil unlimited cases[15] was slightly less favorable at 93%.[16]  (*Id.* at xv.)

As the phrase suggests, the disposition time measures the duration between the filing of an action and its termination or other disposition.  The SDNY Profile includes statistics that measure the median disposition time from filing to trial for civil cases and the percentage of civil cases more than three years old.  The numbers fluctuated during the same six year period, but during the most recent fiscal year, they were 27.2 months and 18.5%, respectively.  The Trust has demanded a jury trial, (*Complaint* at p. 33), and will have to move to withdraw the reference for that purpose, adding to the disposition time in the New York Federal Court.  The statewide statistics suggest that the California Superior Courts are disposing of unlimited civil cases at a slightly faster pace.  During the twelve, eighteen and twenty four months after filing, they disposed of 64%, 76% and 83%, respectively.  (2016 CSR at 71.)

Lastly, the SDNY Profile shows that the *weighted* filings (both civil and criminal) per judge was 470 for the fiscal year ending September 30, 2016.  The statistics provided

---

[14]       The 2016 CSR is available at http://www.courts.ca.gov/documents/2016-Court-Statistics-Report.pdf (last visited July 17, 2017).  Excerpts are annexed to the *Winston Declaration* as Exhibit 6 and the *Shamah Declaration* as Exhibit 13.

[15]       An "unlimited civil" case is a matter with a value of more than $25,000.  (2016 CSR at 63.)  This adversary proceeding would qualify as an unlimited civil case.

[16]       The parties did not provide statistics for civil clearance rates in Los Angeles County Superior Court.

by the parties do not indicate the average caseload per judge in the California state courts.

These statistics indicate that whatever their caseloads, the judges of the two courts are equally adept at clearing them.  Beyond that, the parties are comparing apples and oranges.  They measure radically different types of cases in the two courts. According to the Los Angeles Superior Court 2015/2016 Annual Report ("LASC Report") there were 1,892,582 total filings in that court during fiscal year 2016.[17]  (LASC Report at 29.)  More than 60%, or 1,141,044 cases, were classified as "traffic infractions," (*id.*), a term that describes "traffic-related violations of state statutes or city or county ordinances specified as infractions, excluding parking violations."  (2016 CSR at 63.) Presumably, traffic cases are simpler and more quickly dealt with than the types of civil cases usually filed in the New York Federal Court.

The difference in the types of cases undoubtedly affects the judge's caseload.  In Los Angeles, 3,231 cases were filed per judge in fiscal year 2015, and each judge managed to dispose of 3,527 cases on average during that same period.  (2016 CSR at 82.)  During the same approximate period (fiscal year ended September 30, 2015), the SDNY Profile shows that each New York Federal Court judge, on average, received a total of 444 cases and terminated 472 cases.

---

[17]     The LASC Report is available at http://www.lacourt.org/newsmedia/uploads/1420161115146252016AnnualReport.pdf (last visited July 17, 2017).  An excerpt is attached to the *Shamah Declaration* as Exhibit 12.  The total filings in the previous fiscal year were 1,891,060, (2016 CSR at 82), so the numbers are comparable.

As a result, caseload comparisons and dispositions are not particularly meaningful, and the statistical comparisons do not persuasively show one way or the other which court has a greater backlog.[18]  "With no persuasive evidence on the issue in front of us, we cannot presume one court's backlog is more manageable than the other's."  *Allstate Ins. Co. v. Credit Suisse Secs. (USA) LLC*, 2011 WL 4965150, at *7.  Furthermore, neither party has provided any statistics relating to this Court where the case will be pre-tried until the reference is withdrawn by the New York Federal Court to conduct the jury trial.

### 3.   Factor Two: The Factual and Legal Issues

CORE argues this is a tort case based on state law as to which federal judges have no special expertise, California law may govern the tort claims, and California state court is likely better equipped to address the legal complexities.  (*Motion* at 14.)  At a minimum, the California court is the transferor court, and California law will determine whether California or New York law governs the tort claims.  *Van Dusen v. Barrack*, 376

---

[18]   The Defendants point to the *Venue Decision* in which the California Federal Court commented that "the court system in New York is less congested than California Superior Court." (*Venue Decision* at 10.)  The *Venue Decision* concerned the transfer of the lawsuit from one *federal* court to another *federal* court, and referred the remand issue to the New York Federal Court or this Court.  The reference to the congestion in the California State Court was, therefore, *dicta*.  In addition, the question before this Court is not which court is more congested; the question is whether the action can be "timely adjudicated" in California State Court.  Although the questions are related, they are not the same.  As the statistics show, the filings in Los Angeles County are certainly higher than in the New York Federal Court, but each court consistently clears nearly 100% of its cases, and the California state court may also dispose of the civil cases faster.

The Defendants also argue that Los Angeles Superior Court operates on a budget that provides "only 70% of what its workload demands," (LASC Report at 5), and this has contributed to court delays. (*Id.*)  The Defendants have failed to show that the delays in California State Court are any greater (and may be less) than the delays in the New York Federal Court, and notwithstanding the budget issues, the California state courts are getting the work done efficiently.  Furthermore, every federal judge can attest to the decline in judiciary funding, especially after sequestration, and the efforts to deal with reduced budgets through space reductions, consolidation of the bankruptcy and district court clerk offices, and shared administrative services.

U.S. 612, 638-39 (1964) (holding that transferee court must apply choice-of-law rules of state in which transferor court sits); *see Statek Corp. v. Dev. Specialists, Inc.* (*In re Coudert Bros. LLP*), 673 F.3d 180, 191 (2d Cir. 2012).

The Defendants contend the California State Court would have to defer to this Court on issues of privilege arising out of the Litigation Trust Agreement over which this Court has exclusive jurisdiction. (*Defendants Memo* at 19.) Furthermore, the key witnesses are located in New York, and the discovery process would be cumbersome. (*Id.* at 19-20.) Discovery disputes that result in conferences and motion practice would add to the legal issues that must be decided and extend the length of time needed to resolve the action.

The Defendants also argue that this Court has greater experience presiding over complex commercial disputes and is better-equipped to address the issues of New York law that pervade the case. (*Id.* at 20.) They even suggest that the California State Court is not up to the task; the non-complex case designation "would prevent this case from being placed in a program that assigns judges based on 'ability, interest, training, experience (including experience with complex civil cases), or willingness to participate in educational programs related to the management of complex cases.'" (*Id.* at 19 (quoting CAL. RULES OF COURT, Standard 3.10(c)).) In addition, judges handling complex cases "should be given research attorney and administrative staff assistance when possible." CAL. RULES OF COURT, Standard 3.10(h).

Neither side has persuasively argued that the factual or the legal issues are "especially complex," and the California State Court's refusal to designate the lawsuit as

a complex case implies that it does not either.  Furthermore, the Defendants filed the

*Notice of Removal* approximately five months after the Trust commenced the action,

and the interim was primarily consumed by the procedural maneuvers in the California

State Court and the California Federal Court.  The California State Court did not have

occasion to familiarize itself with the facts beyond the dispute over the non-complex

designation, and accordingly, the relative familiarity of the courts with the facts does not

tip the balance in favor of either forum.  *Allstate Ins. Co. v. Credit Suisse Secs. (USA)

LLC*, 2011 WL 4965150, at *7.

       Although the legal issues do not appear to be "especially complex," a New York

court may have greater familiarity with the law governing the tort claims.  Initially, the

California Federal Court is the transferor court, and the New York Federal Court would

have to apply the California conflict rules to determine whether California or New York

law governs the tort claims.  *See Van Dusen*, 376 U.S. at 638; *Coudert Bros.*, 673 F.3d at

191.  The California State Court is undoubtedly more familiar than this Court with those

rules.  Furthermore, the Defendants' arguments relating to the supposed connection

between privileges and the Litigation Trust Agreement – which this Court is presumably

in a better position to decide – is not persuasive.  Under § 2.2 of the Litigation Trust

Agreement, the Trust

> shall succeed to and constitute the assignee of all rights, powers and
> privileges that, before the Effective Date of the Plan, could be exercised by
> the Debtors, the Estates, the First Lien Lenders, the Second Lien Lenders,
> the Creditors' Committee, any representative of the Estates, and any
> comparable authority or equivalent authority in any foreign jurisdiction,
> including a trustee or examiner with expanded powers, with respect to any
> suits, proceedings or Causes of Action against any Person (other than the
> Released Parties).

Although this Court retained exclusive jurisdiction to interpret the Litigation Trust

Agreement, the Defendants have not identified any ambiguity or explained why that

document will have to be interpreted to resolve any privilege disputes.  In addition, in

the one example of a discovery dispute supplied by the Defendants, Valuation Research

Corporation ("VRC") refused to provide information to the Trust because VRC was

retained to provide services to the Board of Directors of CORE Media, Inc. rather than to

CORE Media.  (*See Shamah Declaration*, Ex. 9.)  This objection raises a question of

non-bankruptcy law regarding who owns the privilege – CORE or the CORE Board of

Directors.  *See, e.g.*, *Krys v. Paul, Weiss, Rifkind, Wharton & Garrison LLP* (*In re China

Med. Techs., Inc.*), 539 B.R. 643, 658 (S.D.N.Y. 2015) (concluding that under federal

common law, a foreign liquidator had the right to privileged documents and information

in the possession of a law firm retained to represent the foreign debtor's audit

committee).  If CORE possessed the privilege under applicable non-bankruptcy law, it

passed to the Trust under the unambiguous terms of the Litigation Trust Agreement.  If

it did not belong to CORE, it could not be assigned by CORE to the Trust or anyone else.

On the other hand, it appears that the merits of the tort claims will be determined

under New York law.  The parties briefed the choice of law issue in connection with the

motion to transfer venue.  The Trust argued that California law governed.  (*See Shamah

Declaration*, Ex. 11, at 19 & n. 12.)  The Defendants contended that New York law

controlled.  (*See Supplemental Winston Declaration*, Ex. 7, at 11-12 & 12 n.2.)  The

California Federal Court opined that New York tort law would likely govern most of the

claims.  (*Venue Decision* at 10 ("The Court also finds that . . . the Southern District of

New York is better-equipped to decide the legal issues in this case, as New York law will

likely govern most, if not all, of the claims here.").)  While the California Federal Court was deciding a motion to change venue and was not performing a choice of law analysis or deciding which law actually governed CORE's claims, its observations are entitled to weight on the issue before the Court.  Accordingly, it appears more likely (although I am not deciding) that New York's substantive tort law will apply under California's conflicts rules.  Although the parties have failed to identify any unsettled issues or explain why California or New York law is "especially complex," the New York Federal Court is presumably more familiar with New York tort law, and I give the edge to New York.

Accordingly, the evidence on Factor One does not indicate that the backlog in the California State Court is any greater than in the New York Federal Court, but the evidence on Factor Two weighs slightly in favor of adjudication in New York.

### 4.    Factors Three and Four

Because the first two factors do not show that this Court will be a timelier forum, it is unnecessary to consider the last two factors.  *See Post Invs. LLC v. Gribble*, 2012 WL 4466619, at *6; *Allstate Ins. Co. v. Credit Suisse Secs. (USA) LLC*, 2011 WL 4965150, at *8.  Nevertheless, these factors weigh strongly in favor of abstention.

Taken together, these factors focus on the related issues of the status of the chapter 11 proceeding and the degree to which a state court proceeding will prolong the administration or liquidation of the case.  First, this is a confirmed case and the disposition of the adversary proceeding will not affect its status.  The Debtors do not require the resolution of the adversary proceeding to know whether they can continue their operations.

Second, while the case has not been fully administered for other reasons, a remand of this adversary proceeding to the California State Court will not prolong its administration.

> Factors that the court should consider in determining whether the estate has been fully administered include (1) whether the order confirming the plan has become final, (2) whether deposits required by the plan have been distributed, (3) whether the property proposed by the plan to be transferred has been transferred, (4) whether the debtor or the successor of the debtor under the plan has assumed the business or the management of the property dealt with by the plan, (5) whether payments under the plan have commenced, and (6) whether all motions, contested matters, and adversary proceedings have been finally resolved.

FED. R. BANKR. P. 3022 advisory committee notes (1991). Importantly, entry of a final decree should not be delayed "solely because the payments required by the plan have not been completed," and "[t]he court should not keep the case open only because of the possibility that the court's jurisdiction may be invoked in the future." *Id.*[19]

These bankruptcy cases have been confirmed, the Debtors are continuing their operations, and they have *commenced* payments under the *Plan.* (*Reorganized Debtors' First Post-Confirmation Status Report*, dated Apr. 19, 2017, at ¶ 8 ("*Status Report*") (ECF Main Case Doc. # 603).) The cases remain open because there are pending unresolved claims objections, (*id.* at ¶¶ 5-6), and the Court is presiding over one adversary proceeding entitled *19 Entertainment, Inc. v. Phillips* (*In re AOG Entertainment, Inc.*), Adv. Proc. No. 16-01074 (SMB).[20]  (*Id.* at ¶ 9.)  Once the claims

---

[19]     Keeping these cases open longer than necessary may have significant financial consequences for the reorganized Debtors who are not even parties to this adversary proceeding. They must continue to pay U.S. Trustee quarterly fees while the cases remain open. *See* 28 U.S.C. § 1930(a)(6).

[20]     The Court abstained on a limited basis to permit the Chief of the California Department of Industrial Relations, Division of Labor Standards Enforcement to rule on specific questions, but instructed the parties to return to this Court following that determination. *See 19 Entm't, Inc. v. Phillips*

objections and the *Phillips* matter are resolved, this case will be fully administered if the Court abstains from hearing this action.

The Defendants mistakenly argue that these cases must remain open until the adversary proceeding is resolved and the distributions, if any, to the unsecured creditors are completed.  (*Defendants Memo* at 20 ("Here, prompt resolution is important because distributions to general unsecured creditors cannot proceed, and a final decree closing the bankruptcy case cannot be entered, until this case concludes.").)  If the Trust prevails and recovers money, the litigation proceeds will be distributed it in accordance with the *Plan* without any further involvement by the Court.  In addition, as the advisory committee's notes make clear, it is the commencement of distributions and not the completion of distributions that is determinative.  Thus, once the Court resolves the pending and any future claims objections and completes its work in connection with the *Phillips* litigation, the bankruptcy cases will be fully administered despite the pendency of this action in the California State Court.

In conclusion, given the Court's determinations that it has only non-core jurisdiction and the action can be timely adjudicated in the California State Court, and the parties' agreement that the four remaining factors weigh in favor of mandatory abstention, the Court concludes that abstention is mandatory under 28 U.S.C. § 1334(c)(2).  In light of this determination, the Court does not decide whether it should

---

(*In re AOG Entm't, Inc.*), Adv. Proc. No. 16-01074 (SMB), 2016 Bankr. LEXIS 4514, at *36-37 (Bankr. S.D.N.Y. Dec. 30, 2016).

35

remand this action on equitable grounds pursuant to 28 U.S.C. § 1452(b), or abstain in

the exercise of its discretion pursuant to 28 U.S.C. § 1334(c)(1).

Submit order.

Dated:   New York, New York
          July 17, 2017

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Court